NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-869

ADOPTION OF DELILAH.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a decree issued by a Juvenile Court judge finding him unfit and terminating his parental rights to his child, Delilah.  See G. L. c. 119, § 26; G. L. c. 210, § 3.  The judge's finding of unfitness was based primarily on three grounds:  (1) multiple incidents of domestic violence committed in front of Delilah; (2) serious medical neglect of Delilah; and (3) the father's choice to maintain a relationship with the mother and bring her to supervised visits with Delilah despite a history of domestic violence, substance misuse, and codependency.  The evidence provided sufficient support for the judge's findings and conclusions.  Moreover, we are unpersuaded by the father's argument that due to alleged ineffective

_____

[1] A pseudonym.

assistance of counsel, the judge abused her discretion by denying his motion for a new trial.[2]  Accordingly, we affirm.

Background.  1.  Events leading to filing of care and protection petition.  Delilah was born in December 2017.  She was removed from her parents' care and custody by the Department of Children and Families (department) on August 24, 2021, at age three, following a serious incident of domestic violence by the father against the mother.  The department filed the underlying care and protection petition the next day.  Despite this, the parents stayed together and had a second child who was also removed by the department.[3]  Delilah was eventually placed with her sibling in a preadoptive home.

2.  The father.  The father's relationship with the mother has been marked by mutual domestic violence and substance misuse.  The father has acknowledged that the mother also has extensive mental health issues but admitted that he did not alert the department to these issues until the date of trial.[4]

---

[2] The father's appeals from the decree and from the order denying his motion for a new trial were consolidated for briefing and decision in this court.

[3] Both parents' parental rights to the second child were terminated in a separate proceeding in the winter of 2024; the second child is not a party to this appeal.

[4] Both parents stipulated to their unfitness in October 2022.  A review and redetermination trial was then held over four nonconsecutive dates from April to June 2024, after which the judge issued the decrees terminating the parents' rights.

On the first day of trial, the mother stipulated to the termination of her parental rights and entered into an open adoption agreement.[5]  Despite their turbulent history, the father maintained a relationship with the mother, visiting Delilah together up until trial.

     a.  <u>Domestic violence</u>.  Police documented at least four separate incidents of domestic violence between the mother and the father.  The department recommended that the father engage in services to address the impact of violence on his family prior to Delilah's removal, but he declined to do so.  Police then documented one more incident of domestic violence in May 2023, after Delilah had been removed.  At trial, both the father and the mother minimized the violence in their relationship.  In fact, the father denied any physical abuse and admitted only that he had been verbally and emotionally abusive to the mother. The judge did not credit this testimony.

     b.  <u>Criminal record</u>.  The father has a lengthy criminal record, spanning over ten years from 2014 to 2024.  He has been arraigned on twenty-one adult charges.

---

The judge also ordered that the father was entitled to two posttermination visits per year; additional visits, if any, were to be at the discretion of the adoptive parents.

   [5] The mother is not a party to this appeal.

Most relevant for these purposes, on August 23, 2021, the father allegedly assaulted the mother and was charged with assault and battery on a household member, assault and battery by means of a dangerous weapon, strangulation, and intimidation of a witness. On the same date, the mother obtained an ex parte G. L. c. 209A abuse prevention order requiring the father to have no contact with her, stay away from her, and to relinquish custody of Delilah to her. The mother did not extend the order and it expired on September 3, 2021. At trial, the mother testified that the criminal charges arising from this incident were dismissed because she refused to cooperate with the government and testify against the father, and the father denied that this incident had become physical. The judge did not credit his denials and found that the father had assaulted the mother.

c. <u>Mental health and substance misuse</u>. The father has been diagnosed with general anxiety disorder and post-traumatic stress disorder (PTSD). The father also has a history of substance misuse. He began using ecstasy and cocaine at age thirteen. During the parents' relationship, he used fentanyl, cocaine, heroin, and benzodiazepines.

At trial, the father minimized his history of substance misuse. He claimed that it never became an addiction or "too much of an issue" for him. In fact, however, his treatment

4

record indicated that his opiate dependence had lasted for several years as in 2022, he self-reported to a treatment program that his longest length of sobriety had been sixty days when he was incarcerated.

d. <u>Inability to separate from the mother</u>. After Delilah's removal, the father engaged in therapy, where he admitted that his relationship with the mother was codependent and "not healthy." At trial, the father testified that he lived alone, a claim the judge explicitly did not credit. The father and mother were still in a romantic relationship on September 27, 2023. The father admitted that he talked to the mother weekly, gave her rides to drug screens, brought her to parent-child visits with Delilah, and still wanted her to be a mother to her children. As a result, the judge found that the father is unable to maintain healthy boundaries with the mother in order to serve Delilah's best interests.

3. <u>Engagement with services</u>. a. <u>Department action plans</u>. The department first became involved with the family in February of 2019. Beginning in June 2019, the department drafted action plans for the father. After Delilah's removal, the father failed to meet consistently with the department. He met with the department once in March 2022 and then from August to October and December of 2022. The father did not meet consistently with the department in 2023.

In 2022 and 2023, the father began engaging with services. In March 2022, the father and mother reported to the department that they had participated in a substance misuse detoxification program in January 2022. The father did not complete treatment but in February 2022, he began receiving suboxone through participation in a research program. He had clean toxicology screens in March and April 2022 but did not share results from May and June. He provided screens regularly from July 2022 onward. He relapsed on cocaine again in October 2022. In November 2022, he enrolled in a weekly substance misuse early recovery group, which he attended until June 2023. Despite the father's participation in treatment, based on his trial testimony that substance misuse was not an issue for him, the judge found that he continued to lack insight into his substance misuse.

The father completed a parenting class in September 2022. He completed a four-hour domestic violence course in October 2022. In October 2023, he completed a ten-class anger management course. He also enrolled in an intimate partner abuse education program in May 2024 (after the trial had begun) and continued to attend throughout the trial. The father was able to testify as to a definition of domestic violence that showed that he had some understanding of its effect on Delilah. But, despite this participation, the judge concluded that the

6

father derived no tangible benefit to aid his parenting skills because at trial he continued to deny his responsibility in the history of mutual domestic violence between him and the mother. The judge found that this lack of insight placed Delilah at risk of future abuse and neglect.

In October 2022, the father was assigned an individual therapist but did not meet with her. He was assigned a second therapist in February 2023, with whom he met twice. He was assigned a third therapist in April 2023, and he met with her regularly until 2025. Although the father began to discuss his codependency issues with the mother, he continued to maintain his relationship with her. As a result, the judge found that the father had not taken the steps necessary to establish healthy boundaries with the mother in order to serve Delilah's best interest.

b. Visitation. The father did not consistently visit Delilah from August 2021 to December 2021. He had no contact at all with her from January 2022 through most of March 2022. He began visiting her again on March 29, 2022. Between January 27, 2023 and May 16, 2024, the father missed eight visits. He was visiting Delilah consistently at the time of trial.

The father has attended visits with the mother. In July 2023, the mother tested positive for cocaine and sent a text message to the father asking him to obtain a clean urine sample

7

for her.  As a result, the department reduced the parents' visits to once per month.  Despite this, the father continued to visit Delilah with the mother.

4.  Delilah's care.  When the father and mother had custody of Delilah, she was behind in routine medical care.  The parents failed to bring her to her eighteen-month and two-year pediatrician visits.  The parents brought Delilah to her three-year visit on February 5, 2021, during which her doctor noted that she was underweight and had a noticeable limp on her left side.  The doctor recommended follow-up appointments to check her weight and early intervention for the limp, but the parents repeatedly cancelled them.  The parents cancelled or failed to appear for seventeen appointments between August 2019 and August 2021.

After Delilah's removal, she was referred to physical therapy for her limp.  She participated in therapy until August 2023 when she was discharged due to the progress she had made.  In the fall of 2023 Delilah began playing soccer and was also enrolled in swimming and dance classes as well as Girl Scouts.

At trial, Delilah was medically up to date.  She had a developmental delay in emotional regulation and an individualized educational plan for social and emotional needs.  After a psychological evaluation in April 2022, she was diagnosed with PTSD and began treatment with an individual

8

therapist in February 2023.  She had difficulty regulating her emotions in a school setting and responded to certain triggers with tantrums.  By trial, she had made progress socially and developmentally.  The frequency of her tantrums decreased since being placed in her preadoptive home, but she required consistent adult support and supervision.

Discussion.  1.  Standard of review.  "To terminate parental rights to a child and to dispense with consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted).  Adoption of Darlene, 99 Mass. App. Ct. 696, 702 (2021).  See Adoption of Ilona, 459 Mass. 53, 59 (2011).  "Because termination of a parent's rights is an 'extreme step,'. . . a judge must decide both whether the parent is currently unfit and whether . . . 'there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary'" (citations omitted).  Adoption of Ilona, supra.  "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary."  Id. at 59-60.  We recognize that, in the context of

parental fitness, the "judge who hears the evidence, observes the parties, and is most familiar with the circumstances remains in the best position to make the judgment [regarding fitness]." Adoption of Lisette, 93 Mass. App. Ct. 284, 292 (2018), quoting Guardianship of Estelle, 70 Mass. App. Ct. 575, 579 (2007).

"We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. at 59. An abuse of discretion occurs only where "the judge made a clear error of judgment in weighing the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

2. The father's unfitness. We review the judge's decision to assess whether the father's unfitness was, in fact, supported by clear and convincing evidence. See Adoption of Darlene, 99 Mass. App. Ct. at 702-703. When making such a determination, the judge must "make specific and detailed findings demonstrating that close attention had been given [to] the evidence." Adoption of Leland, 65 Mass. App. Ct. 580, 583 (2006). A finding of unfitness is "not a moral judgment or a determination that the [parent] . . . [does] not love the child"

10

(citations omitted).  Adoption of Bea, 97 Mass. App. Ct. 416, 417 n.2 (2020).  Rather, "parental unfitness means grievous shortcomings or handicaps that put the child's welfare much at hazard" (quotations and citations omitted).  Adoption of Jacob, 99 Mass. App. Ct. 258, 262 (2021).  "In ascertaining parental fitness, the judge may consider past conduct to predict future ability and performance" (quotation and citation omitted).  Id.

In the present case, after a four-day trial, the judge made 179 findings of fact and forty-five conclusions of law.  In her lengthy findings, she demonstrated the requisite close attention she gave to the evidence.  See Adoption of Quentin, 424 Mass. 882, 886 (1997).  As mentioned, the judge focused on three primary issues:  (1) domestic violence; (2) serious medical neglect of Delilah; and (3) the father's choice to maintain a relationship with the mother against Delilah's best interest.

The judge found that the parents had engaged in multiple incidents of domestic violence in front of Delilah.  The father denied that these incidents had occurred, but the judge repeatedly found that father's denials were not credible.  Moreover, the judge found that the father lacked insight into the effect of domestic violence on his relationship and his ability to parent Delilah.[6]

---

[6] The father's challenges to the judge's findings about this evidence are unavailing in light of the number of documented

11

The judge also noted that the father had a long history of substance misuse. The judge cited the father's minimization of that history as demonstrating a lack of insight into the effect of substance misuse on his relationship with the mother and with Delilah.

Also, the judge found that the while Delilah was in his care, the father neglected Delilah's medical care. Delilah missed seventeen medical appointments in the first three years of her life, including her eighteen-month visit and her two-year visit. She was underweight and had developed a limp, which required months of physical therapy to correct. The judge also determined that Delilah has special needs, which the father would not be able to meet given his inability to acknowledge his own shortcomings. The judge noted that Delilah's needs are being met by the preadoptive family placement.

Finally, the judge found that despite the father's acknowledgment that he had a codependent relationship with the mother, he refused to establish healthy boundaries with her in

---

incidents of domestic violence in Delilah's presence; the quality of the contemporaneous documentation of physical injury and the father's flight from police officers; and the father's repeated denials that he had ever physically assaulted the mother in spite of this evidence.

order to serve Delilah's best interest.  Indeed, the father continued to visit Delilah with the mother throughout the trial.[7]

All of the judge's findings were well-supported by the record.  In arguing that the judge's finding of unfitness was not supported by clear and convincing evidence, the father asserts that he "worked diligently in his substance treatment" and that the evidence of both domestic violence and substance abuse was stale.  The primary problem with this argument is that at trial, the father still refused to acknowledge that he had engaged in physical domestic violence and denied that he had ever developed an addiction to controlled substances.  The judge appropriately concluded that this continuing denial demonstrated an ongoing lack of insight that supported a finding of unfitness.  Moreover, the judge properly considered the relevant factors in her overall determination that the father is unfit to parent Delilah.

For these reasons, we discern no error in the judge's determination that the father is unfit and that "[his] unfitness

---

[7] The father challenges the materiality of his inability to establish healthy boundaries with the mother as there was no showing that it affected Delilah.  This argument is unavailing given the parents' history of perpetrating domestic violence in Delilah's presence and the father's acknowledgment that the mother had ongoing mental health and substance misuse issues and had stipulated to her own unfitness.

is likely to continue into the indefinite future to a near certitude."[8]

3.  <u>The child's best interests</u>.  The record likewise supports the judge's findings and ultimate conclusion that termination of the father's rights was in Delilah's best interests.  See <u>Adoption of Yalena</u>, 100 Mass. App. Ct. 542, 553 (2021).  "[T]he best interests analysis . . . requires a court to focus on the various factors unique to the situation of the [child] for whom it must act."  <u>Custody of a Minor</u>, 375 Mass. 733, 753 (1978).  "The standard for parental unfitness and the standard for termination are not separate and distinct, but 'reflect different degrees of emphasis on the same factors.'"  <u>Adoption of Nancy</u>, 443 Mass. 512, 515 (2005), quoting <u>Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption</u>, 367 Mass. 631, 641 (1975).  "In determining whether the best interests of the children will be served by issuing a decree dispensing with the need for consent, a 'court shall consider the ability, capacity, fitness and readiness of the child's parents . . . [to assume parental responsibility] and shall also consider the plan proposed by the department or

---

[8] The father does not address in his brief the judge's finding that his unfitness is likely indefinite.  Accordingly, we do not address this issue further.  See <u>Board of Registration in Med</u>. v. <u>Doe</u>, 457 Mass. 738, 743 n.12 (2010).  See also Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

14

other agency initiating the petition.'" Adoption of Nancy, 443 Mass. at 515-516, quoting G. L. c. 210, § 3 (c).

The judge found that the father "is currently unfit to assume parental responsibility for the subject child"; that his unfitness is "likely to continue into the indefinite future to a near certitude"; and that the child's best interests "would be best served by the termination of parental rights of [the father]." This decision was based on her thorough review of record evidence of the father's ability and capacity to parent Delilah. The judge also properly considered Delilah's interests in remaining with the preadoptive family, who, the judge found, have been effectively, safely, and successfully parenting Delilah since February 2023. The judge found that Delilah has thrived in the care of her preadoptive parents. All of these findings are well supported by the evidence, and we perceive no clear error or abuse of discretion.

Finally, the judge considered the provisions of G. L. c. 210, § 3 (c), and found factors (ii), (iii), (iv), (vi), (vii), (viii), (x), and (xii) to be applicable. We discern no clear error or abuse of discretion in the judge's analysis of the relevant factors. The record evidence provides clear support for the judge's findings and determination that the father is unfit, that he is likely to remain so indefinitely,

15

and that termination of his parental rights was in Delilah's best interests.

4. <u>Ineffective assistance of counsel</u>. The father argues that his trial attorney provided ineffective assistance of counsel because he did not present evidence of the father's engagement with services or speak to potential witnesses. In order to establish ineffective assistance, the father has to establish that his counsel's performance was both unreasonable and prejudicial. See <u>Adoption of Azziza</u>, 77 Mass. App. Ct. 363, 368 (2010). "[P]rejudice is not shown if there is overwhelming evidence of unfitness." <u>Id</u>.

First, as noted above, the judge carefully and comprehensively considered the father's engagement in services. Therefore, the father has failed to demonstrate that his attorney's performance on that issue was unreasonable. Second, the father has not presented affidavits from any additional witnesses his attorney might have interviewed, except from his final therapist. And the father failed to explain how that therapist could have been helpful, given that the father continued to deny that he had engaged in physical domestic violence and that substance misuse had been an issue. In short, the father failed to establish how any additional witnesses would have provided a "substantial ground of defense" (citation omitted). <u>Care and Protection of Stephen</u>, 401 Mass. 144, 149

16

(1987).  Finally, the evidence of unfitness was sufficient to preclude a finding of prejudice.  See Adoption of Azziza, 77 Mass. App. Ct. at 368.  See also Care and Protection of Georgette, 439 Mass. 28, 33 (2003) (even if [the child's] trial counsel provided unreasonable performance, she failed to

demonstrate any prejudice based on the strong evidence of the father's unfitness).[9]

Decrees affirmed.

Order denying motion for new trial affirmed.

By the Court (Blake, C.J., Shin & Wood, JJ.[10]),

Clerk

Entered:  July 1, 2026.

---

[9] The father argues that his trial attorney provided ineffective assistance of counsel because he failed to investigate the mother's unfitness.  Even after the mother stipulated to her own unfitness, the father testified that he would allow the mother up to six visits a year should he regain custody of Delilah.  In these circumstances, the father has not shown that further investigation into the mother's fitness would have been relevant to his own fitness.

[10] The panelists are listed in order of seniority.